# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| OTTO CANDIES, LLC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0435-MTZ |
| | ) | |
| KPMG, LLP, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION
Date Submitted: June 16, 2020
Date Decided: August 21, 2020

David E. Ross, ROSS, ARONSTAM & MORITZ LLP, Wilmington, Delaware; Terry L. Wit, Juan P. Morillo, Derek L. Shaffer, Lauren H. Dickie, and David H. Needham, QUINN EMANUEL URQUHART & SULLIVAN, LLP, San Francisco, California and Washington, D.C., *Attorneys for Plaintiffs*

Kevin R. Shannon, Matthew F. Davis, and Christopher N. Kelly, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Gregory G. Ballard and Jose F. Sanchez, SIDLEY AUSTIN LLP, New York, New York; *Attorneys for Defendant KPMG Cárdenas Dosal, S.C.*

Todd Schiltz, DRINKER BIDDLE & REATH LLP, Wilmington, Delaware; Robert A. Scher and Jonathan H. Friedman, FOLEY & LARDNER LLP, New York, New York; *Attorneys for Defendant KPMG, LLP*

Timothy Jay Houseal, Jennifer M. Kinkus, William E. Gamgort, YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware; Ana C. Reyes, WILLIAMS & CONNOLLY, LLP, Washington, D.C.; *Attorneys for Defendant KPMG International Cooperative*

**ZURN, Vice Chancellor.**

Oceanografía S.A. de C.V. ("OSA") used to be the largest offshore oil services company in Latin America, until it succumbed to the consequences of a massive financial fraud it perpetuated with its bank. OSA creditors, bondholders, and business counterparts ("Plaintiffs") claim OSA's auditor, KPMG Cardenas Dosal, S.C. ("KPMG Mexico"), committed negligent misrepresentations in auditing OSA, and failed to detect OSA's fraud. The fraud sent OSA into bankruptcy and has inspired a wide array of litigation.

In this action, Plaintiffs presently seek to hold KPMG LLP ("KPMG US") liable as KPMG Mexico's direct agent and via a sub-agency relationship with KPMG International Cooperative ("KPMG International," and together with KPMG Mexico and KPMG US, "Defendants"). Plaintiffs also seek to hold KPMG US liable as part of a joint venture with KPMG Mexico and KPMG International. Defendants moved to dismiss on several theories, including that Plaintiffs have failed to plead a route for holding KPMG US vicariously liable for any shortcomings in KPMG Mexico's OSA audits. In this opinion, I conclude Plaintiffs fail to plead vicarious liability through any theory of agency or joint venture. Plaintiffs' claim against KPMG US is dismissed with prejudice.

1

## I. BACKGROUND

In considering Defendants' second motion to dismiss, I draw the relevant facts from the allegations in, and those documents incorporated by reference into, the Amended Complaint.[1] I refer readers to the background section of the first motion to dismiss opinion (the "First Opinion") for a full recitation of the facts.[2] Here, I provide only the background relevant to this decision.

OSA had a banking relationship with Citigroup, Inc. ("Citigroup") and Citigroup's Mexican subsidiaries, Grupo Financiero Banamex S.A. de C.V. and Banco National de Mexico, S.A. (together, "Banamex"). In 2008, Citigroup established a credit facility within Banamex for Petroleos Mexicanos ("Pemex") contractors, including OSA.[3] Pemex is Mexico's state-owned oil and gas company and OSA's largest client.[4] OSA began participating in Citigroup's cash advance facility shortly after it was established.[5] The advances started in 2009 with limits of $70 million, but by 2014, the advances ballooned to over $500 million.[6]

---

[1] Docket Item ("D.I.") 102 [hereinafter the "Amended Complaint" or "Am. Compl."].

[2] *Otto Candies, LLC v. KPMG LLP*, 2019 WL 994050, at *2–6 (Del. Ch. Feb. 28, 2019).

[3] Am. Compl. ¶ 189.

[4] *Id.* ¶¶ 8, 11.

[5] *Id.* ¶ 189.

[6] *Id.* ¶ 179.

Perhaps as early as 2010, but certainly from August 2013 through February 2014, OSA provided Citigroup with forged and fraudulent invoices for work OSA had not yet performed to continue receiving cash from the line of credit.[7] During this time period, OSA received millions of dollars from Citigroup as a result of the fraudulent scheme.[8] Citigroup and OSA employees who participated in the fraud exploited weak internal accounting controls to perpetuate the scheme. Citigroup and the Mexican government exposed the fraud in February 2013, after which Citigroup withdrew the credit line and OSA crumbled into bankruptcy.

Between 2010 and 2013, KPMG US audited Citigroup, and KPMG Mexico audited OSA and Banamex. KPMG US, a Delaware entity headquartered in New York, and KPMG Mexico, a Mexican entity, are both member firms of KPMG International, a Swiss cooperative that did not directly conduct any relevant audits. Relevant to this decision, KPMG Mexico issued OSA audit opinions for fiscal years 2010, 2011, and 2012 (the "OSA Audit Opinions").[9] Plaintiffs claim KPMG Mexico

---

[7] In the First Opinion, I determined that although Plaintiffs "advance their allegations that the fraud may have begun 'as early as 2010,' . . . Plaintiffs fail to explain how they detrimentally relied on any Audits or related materials issued during a period in which they only speculate that fraud may have been occurring." *Otto Candies*, 2019 WL 994050, at *23. The Amended Complaint's allegations of fraud during the pre-August 2013 period appear tentative, speculative, and conclusory. Am. Compl. ¶¶ 229, 278, 281 n.9, 283. But for purposes of this opinion, I need not reach whether Plaintiffs satisfy Rule 9(b) in alleging fraud commenced prior to August 2013.

[8] Am. Compl. ¶¶ 2, 179, 229−235.

[9] *Id.* ¶¶ 167, 298, 345−351, Ex. A−C.

should have exposed OSA's controls as deficient, and that if KPMG Mexico had complied with certain audit standards, the cash advance fraud would have been detected and prevented.[10] Plaintiffs contend that KPMG US is vicariously liable for KPMG Mexico's negligent misrepresentations in the OSA Audit Opinions.[11]

## A. Procedural History

Plaintiffs began their endeavor to hold KPMG US liable for KPMG Mexico's alleged negligent misrepresentations in auditing OSA on February 26, 2016, when they filed a complaint in Superior Court.[12] The complaint asserted one count of negligent misrepresentation in audits for each of Citigroup, Banamex, and OSA; all three of those counts were brought against all three Defendants.[13] In that complaint,

> Plaintiffs allege[d] that the KPMG entities operated through a complex series of agency relationships, and specifically as a joint venture for the Audits. They allege[d] that KPMG International was the principal to KPMG Mexico and that KPMG US, as the leading revenue generator for the entire KPMG network, was the principal to agent KPMG International. Plaintiffs also allege[d] that KPMG US was responsible for all or virtually all of the work KPMG Mexico performed on . . . the OSA Audits, by virtue of its principal relationship over KPMG Mexico.[14]

---

[10] *Id.* ¶¶ 3, 252, 292−344.

[11] *Id.* ¶¶ 507−518, 526−533.

[12] N16C-02-260 PRW CCLD D.I. ("CCLD D.I.") 1.

[13] *Id.* ¶¶ 467−520.

[14] *Otto Candies*, 2019 WL 994050, at *3 (internal citations omitted).

4

On April 25, 2018, the Superior Court ruled that it lacked subject matter jurisdiction to hear negligent misrepresentation claims, and permitted Plaintiffs the opportunity to transfer venue to this Court under 10 *Del. C.* § 1902.[15] On June 13, Plaintiffs re-filed their complaint in this Court and transferred a fully briefed motion to dismiss all counts against all Defendants from Superior Court to this Court.[16] The parties jointly requested that this Court "rule on the motion to dismiss issues that remain outstanding."[17]

I heard argument in November and issued the First Opinion on February 28, 2019, granting the motion to dismiss under Rules 9(b), 12(b)(2), and 12(b)(6).[18] I held Plaintiffs failed to establish personal jurisdiction over KPMG International and KPMG Mexico under 10 *Del. C.* § 3104, and dismissed those defendants under Rule 12(b)(2).[19] As for KPMG US, I also held Plaintiffs failed to state a claim of negligent misrepresentation under Rule 9(b) and 12(b)(6) because, as pled, KPMG US owed no duty to Plaintiffs, and Plaintiffs failed to plead their reliance on any misrepresentation by KPMG US.[20] The claims involving foreign entities and

---

[15] *Otto Candies, LLC v. KPMG LLP*, 2017 WL 3175619, at *5 (Del. Super. July 26, 2017).

[16] D.I. 1.

[17] D.I. 2 at 2.

[18] *Otto Candies*, 2019 WL 994050, at *30.

[19] *Id.* at *8−13; *id.* at *14−16 (dismissing claims against KPMG Mexico on *forum non conveniens* grounds as well).

[20] *Id.* at *17−23.

conduct occurring abroad also presented a choice of law issue. I determined the claims for negligent misrepresentation failed under Mexico, New York, and Delaware law, and thus, since there was no conflict of laws, I dismissed the claims pursuant to Delaware law.[21] I did not reach the issue of KPMG US' vicarious liability in the First Opinion.[22] And I requested either a stipulated implementing order or letter briefing from the parties regarding whether Court of Chancery Rule 15(aaa) applied to the Rule 12(b)(6) motion briefed in Superior Court, but transferred here.[23]

On March 22, the parties filed their supplemental submissions addressing Rule 15(aaa).[24] On April 25, I issued a decision concluding that Rule 15(aaa) applies when a complaint is transferred to this Court subject to a fully briefed motion seeking dismissal under Rules 12(b)(6) or 23.1, but determined that in the interest of justice,

---

[21] *Id.* at *17.

[22] *Id.* at *8 n.82 ("The parties vigorously dispute the nuances of Plaintiffs' joint venture and agency theories, as well as which law—Delaware, New York, or Mexico—applies to the issue. Because I find that Plaintiffs failed to establish contacts under the long-arm statute, I need not reach these questions."); *id.* at *21 ("Plaintiffs seek to hold KPMG US vicariously liable for KPMG Mexico's audit of OSA under a joint venture or agency theory. I do not evaluate such an imputation because Plaintiffs have also failed to allege KPMG Mexico owed any duty to OSA's creditors and bondholders.").

[23] *Id.* at *30 n.275.

[24] D.I. 77, 78.

Plaintiffs here should have the opportunity to amend their complaint since the decision resolved an issue of first impression.[25]

## B. The Amended Complaint and Motion to Dismiss

On September 16, Plaintiffs filed their Amended Complaint. The Amended Complaint alleges three counts of negligent misrepresentation against all Defendants: Count I in connection with the OSA Audit Opinions, Count II in connection with the Banamex audit opinions, and Count III in connection with the Citigroup audit opinions.[26] Plaintiffs seek $1.1 billion in damages.[27] The Amended Complaint focuses on strengthening the misrepresentation and reliance elements of the negligent misrepresentation claims.[28] The Amended Complaint also adds details regarding an SEC investigation that penalized Citigroup for deficient internal accounting controls.[29]

---

[25] *Otto Candies, LLC v. KPMG, LLP*, 2019 WL 1856766, at *1 (Del. Ch. Apr. 25, 2019).

[26] Am. Compl. ¶¶ 574−627.

[27] *Id.* ¶¶ 1, 28, 40.

[28] The new allegations set forth purported misrepresentations in each audit opinion in the form of block quotes from the opinions themselves. *Id.* ¶¶ 345−369. The Amended Complaint also adds more detail as to how, when, and why each Plaintiff relied on a specific audit opinion. *Id.* ¶¶ 370−436. These allegations provide the reason, time, and location where each Plaintiff relied on a specific audit opinion. *Id.*

[29] *See, e.g.*, *id.* ¶ 278 ("In addition, the SEC found that 'Banamex's internal accounting controls were insufficient to appropriately evaluate numerous red flags, specifically signs that indicated the loans should have been characterized as seller centric,' including: (a) Pemex's refusal in 2010 to pay Banamex on certain invoices Oceanografía had submitted with Banamex . . . ."). These allegations are offered to support Plaintiffs' argument that fraud commenced at OSA in 2010, before the audits at issue were performed.

Finally, the Amended Complaint elaborates on Plaintiffs' theories of vicarious liability. These new allegations describe KPMG International's oversight and discipline of KPMG South Africa as an illustration of KPMG International's ability to exercise control over a member firm.[30] The Amended Complaint does not allege a similar exercise of control over KPMG Mexico. The new allegations also add that the letterhead of the audit opinions made explicit that KPMG Mexico is a member firm of KPMG International.[31]

Defendants moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6) on November 15 (the "Motion").[32] Plaintiffs concede in their answering brief that Counts II and III need not be relitigated today and that those counts are simply being preserved for appeal.[33] The First Opinion continues to govern the dismissal of Counts II and III, and the dismissal of KPMG International and KPMG Mexico. This opinion addresses Count I, which asserts negligent misrepresentation in connection with the OSA Audit Opinions, against KPMG US. On June 16, 2020, I heard argument on the Motion and took the decision under advisement.[34]

---

[30] *Id.* ¶¶ 460−468.

[31] *Id.* ¶ 497.

[32] D.I. 108.

[33] D.I. 110 at 33.

[34] The argument was rescheduled multiple times due to the COVID-19 pandemic, the Court's March 6, 2020, Standing Order, and the parties' preference for an in-person hearing. *See* D.I. 115, 116, 117, 118. In the end, the hearing was held via videoconference. *See* D.I. 118.

Defendants argue that Plaintiffs have failed to adequately plead all elements of a negligent misrepresentation claim with respect to KPMG Mexico's OSA Audit Opinions.[35] To sustain a negligent misrepresentation claim, Delaware law requires that Plaintiffs "must adequately plead that (1) the defendant had a pecuniary duty to provide accurate information, (2) the defendant supplied false information, (3) the defendant failed to exercise reasonable care in obtaining or communicating the information, and (4) the plaintiff[s] suffered a pecuniary loss caused by justifiable reliance upon the false information."[36] Defendants strike at each element, but I do not reach those arguments here, as the Motion turns on Plaintiffs' attempt to hold KPMG US vicariously liable for KPMG Mexico's alleged failures.

Defendants attack Plaintiffs' theories of vicarious liability, arguing Plaintiffs fail to plead any basis under which this Court could reasonably conceive that KPMG US is vicariously liable for KPMG Mexico's actions in relation to the OSA Audit Opinions.[37] Defendants assert that allegations regarding a purported agency relationship must be connected to the underlying conduct at issue, and that Plaintiffs fail to plead any non-conclusory and non-generalized allegations drawing a connection between KPMG International, or KPMG US, and KPMG Mexico's OSA

---

[35] *See* D.I. 108 at 2−4, 15−48.

[36] *Steinman v. Levine*, 2002 WL 31761252, at *15 (Del. Ch. Nov. 27, 2002), *aff'd*, 822 A.2d 397 (Del. 2003).

[37] D.I. 108 at 48−56.

Audit Opinions.[38]  Defendants further argue that Plaintiffs fail to establish that KPMG International, KPMG US, and KPMG Mexico are part of a joint venture in providing professional services to Citigroup, Banamex, and OSA.[39]

As to choice of law, Defendants and Plaintiffs agree that the options are Mexico, Delaware, and New York law; that there is no conflict between those laws; and that Delaware law should apply.[40]  But each side believes each jurisdiction favors their position.  If a conflict of laws is identified, Defendants argue the most significant relationship test points to Mexico law, while Plaintiffs argue the most significant relationship test points to Delaware.[41]

I have determined Plaintiffs failed to adequately plead a theory of vicarious liability under each offered jurisdiction.  Accordingly, since no actual conflict of laws exists, I apply Delaware law to dismiss Count I.

## II.    ANALYSIS

"The standards governing a motion to dismiss for failure to state a claim are well settled:  (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving

---

[38] *Id.* at 48−56.

[39] *Id.* at 56−58.

[40] *Id.* at 11−12; D.I. 110 at 56−57.

[41] D.I. 108 at 11−15; D.I. 110 at 57−60.

10

party; and (iii) dismissal is inappropriate unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"[42] On a motion to dismiss, Delaware courts do not "blindly accept conclusory allegations unsupported by specific facts, nor do [they] draw unreasonable inferences in the plaintiffs' favor."[43]

Plaintiffs' claim against KPMG US in connection with KPMG Mexico's OSA Audit Opinions only survives if they adequately plead vicarious liability. While negligent misrepresentation claims are assessed under the more stringent Rule 9(b) standard of particularity,[44] vicarious liability allegations are assessed under the notice pleading standard.[45] Under that standard, Plaintiffs' theories of vicarious liability are inadequately pled.

Where, as here, the choice of law is an issue, "Delaware courts use a two-part test to determine which sovereign's law to apply when there is a conflict: first, the court determines whether there is an actual conflict of law between the proposed jurisdictions."[46] "Where the ultimate result would be the same under either proposed

---

[42] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896−97 (Del. 2002) (quoting *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 227 (Del. 1982)).

[43] *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010).

[44] *PR Acqs., LLC v. Midland Funding LLC*, 2018 WL 2041521, at *13 (Del. Ch. Apr. 30, 2018).

[45] *Eisenmann Corp. v. Gen. Motors Corp.*, 2000 WL 140781, at *13 (Del. Super. Jan. 28, 2000).

[46] *Bell Helicopter Textron, Inc. v. Arteaga*, 113 A.3d 1045, 1050 (Del. 2015).

11

jurisdiction, there is no actual conflict."[47] "If the proposed jurisdictions would render the same result on a particular claim, differences in the path getting there present only 'false conflicts' that, for choice of law purposes, are not conflicts at all."[48] "In cases where there is a 'false conflict'—meaning there is no material difference between the laws of competing jurisdictions—the court 'should avoid the choice of law analysis altogether.'"[49] "If there is a conflict, the court determines which jurisdiction has the 'most significant relationship to the occurrence and the parties' based on the factors (termed 'contacts') listed in the Restatement (Second) of Conflict of Laws."[50] "In cases where foreign law may be applicable, the party seeking the application of foreign law," in this case KPMG US, has "the burden of adequately proving the substance of the foreign law."[51] Here, Plaintiffs' theories fail under each choice of law.[52] Accordingly, there is no actual conflict of laws.

---

[47] *Otto Candies*, 2019 WL 994050, at *16.

[48] *Id.* at *17.

[49] *In re Bay Hills Emerging P'rs I, L.P.*, 2018 WL 3217650, at *5 (Del. Ch. July 2, 2018) (quoting *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010)).

[50] *Bell Helicopter*, 113 A.3d at 1050.

[51] *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 765 (internal quotation marks omitted) (quoting *Republic of Panama v. Am. Tobacco Co.*, 2006 WL 1933740, at *4 (Del. Super. June 23, 2006), *aff'd sub nom. State of Sao Paulo of Federative Republic of Brazil v. Am. Tobacco Co.*, 919 A.2d 1116 (Del. 2007)).

[52] In *Otto Candies, LLC v. KPMG LLP*, C.A. No. N16C-02-260 PRW CCLD (Del. Super.) [hereinafter "Superior Court Action"], the Superior Court issued a protective order rejecting jurisdictional discovery into, among other things, "KPMG Delaware Entities, including connections between the entities and the audits at issue here[.]" CCLD D.I. 69 [hereinafter "Protective Order"] ¶ 2 (citing CCLD D.I. 59 at 23, n.34). The Protective

Plaintiffs' claim against KPMG US for negligent misrepresentation in the OSA

Audit Opinions is dismissed with prejudice pursuant to Delaware law.

## A. Plaintiffs Have Not Adequately Alleged Vicarious Liability Under Any Theory of Agency.

Plaintiffs press both a direct agency and sub-agency theory to hold KPMG US

vicariously liable for KPMG Mexico's negligent misrepresentations in the OSA

Audit Opinions. Plaintiffs fail to plead either theory under Mexico, Delaware, and

New York law.

---

Order also narrowed the scope of discovery to requests supporting a claim for jurisdiction over KPMG International and KPMG Mexico as to their role, if any, in the Banamex audits. Protective Order ¶ 3.

The parties agreed that former Chancellor Chandler would serve as Special Discovery Master for the dispute over those discovery requests related to the Banamex Audits. The Special Master denied jurisdictional discovery on the grounds that there was "no Banamex-related conduct occur[ing] in Delaware" to impute to foreign entities, and so "it is moot to grant additional jurisdictional discovery to support a joint venture/agency theory of jurisdiction." CCLD D.I. 78 [hereinafter "Final Report"] at 19−27. The Superior Court, in adopting the Final Report, stated that Plaintiffs "ha[d] failed to establish the requisite nexus between the Defendants to show why this Court should exercise personal jurisdiction over the two foreign entities." *Otto Candies, LLC v. KPMG LLP*, 2017 WL 3175619, at *5 (Del. Super. July 26, 2017).

The Superior Court's denial of jurisdictional discovery into Plaintiffs' agency and joint venture theories color my analysis today. The standard for jurisdictional discovery is low: "[o]nly where the facts alleged in the complaint make any claim of personal jurisdiction over defendant *frivolous*, might the trial court, in the exercise of its discretionary control over the discovery process, preclude reasonable discovery in aid of establishing personal jurisdiction." *Hart Hldg. Co. Inc. v. Drexel Burnham Lambert Inc.*, 593 A.2d 535, 539 (Del. Ch. 1991) (emphasis added). The Amended Complaint has done little to cure the deficiencies in the original complaint that led the Superior Court and Special Master to deny jurisdictional discovery into Plaintiffs' frivolous theories of vicarious liability. Although not dispositive, the Superior Court and Special Master's rulings foreshadow my decision here.

13

### 1. Plaintiffs' Allegations of Sub-Agency and Direct Agency

Plaintiffs contend that KPMG Mexico is a sub-agent of KPMG US in an arrangement by which KPMG US is a principal to KPMG International, which in turn is a principal to KPMG Mexico. Under this theory, Plaintiffs must plead two agency relationships to hold KPMG vicariously liable for KPMG Mexico's OSA Audit Opinions.

In attempting to plead that KPMG International is KPMG US' agent, Plaintiffs allege that: KPMG US is a founding member of KPMG International;[53] KPMG US' revenues constitute nearly one-third of KPMG's global revenues;[54] and 40% of the KPMG International Global Management Team are KPMG US personnel, including KPMG International's Chairman and Global Head of Audit.[55]

As for KPMG International's control over KPMG Mexico, Plaintiffs allege that KPMG International has the right to periodically review, investigate, and discipline a member firm.[56] Plaintiffs also allege that KPMG International provides manuals, software, audit standards, and audit procedures to KPMG Mexico.[57] Plaintiffs allege KPMG Mexico acted with KPMG International's implied authority

---

[53] Am. Compl. ¶¶ 442, 516.

[54] *Id.* ¶ 443.

[55] *Id.* ¶¶ 510−14.

[56] *Id.* ¶¶ 469−75.

[57] *Id.* ¶¶ 452, 455, 458, 501−02.

because KPMG International enforced audit policies and procedures for KPMG Mexico, monitored KPMG Mexico's use of intellectual property, administered mandated reviews on KPMG Mexico, and had the ability to impose disciplinary measures on KPMG Mexico.[58]  Plaintiffs provide detailed allegations of KPMG International wielding control over KPMG South Africa, but the allegations regarding KPMG International's oversight and implied authority over of KPMG Mexico are more general.[59]  Plaintiffs do not allege that KPMG International contributed to or controlled the OSA Audit Opinions.

Lastly and more generally, Plaintiffs allege that the KPMG entities present as a unified global organization through KPMG International's objectives;[60] the KPMG International secondment program whereby personnel from one KPMG firm work in other member offices;[61] the use of the KPMG name, which is solely licensed through KPMG International;[62] and the member firms' required compliance with KPMG International's membership criteria, policies, and regulations.[63]

---

[58] D.I. 110 at 48−49 (citing Am. Compl. ¶¶ 445−59, 469−75, 498−99).

[59] Am. Compl. ¶¶ 460−68.  Additionally, the allegations of KPMG Mexico's coordination with KPMG Singapore for work regarding OSA are irrelevant to an agency relationship between KPMG International, KPMG US, and KPMG Mexico.  *See Id.* ¶¶ 476−80.

[60] *Id.* ¶¶ 445−47.

[61] *Id.* ¶ 448.

[62] *Id.* ¶¶ 449−51.

[63] *Id.* ¶¶ 452−59.

Plaintiffs' allegations of a direct agency relationship between KPMG US and KPMG Mexico are more sparse.[64] Plaintiffs allege that KPMG US is a principal to KPMG Mexico "directly through the Citigroup audit" and that KPMG US is "culpable for the knowledge and conduct of KPMG Mexico's personnel in their audits of Oceanografía . . . given the audit clients' extensive business dealings and overlapping audit issues between the two engagements."[65] Plaintiffs emphasize that Citigroup, Banamex, and OSA have extensive business dealings together and that because of the line of credit, KPMG US' engagement with Citigroup overlaps with KPMG Mexico's engagement with OSA and Banamex.[66] Plaintiffs also state that KPMG Mexico is a registered accounting firm with the Public Company Accounting Oversight Board ("PCAOB"), that PCAOB lists KPMG Mexico "as an affiliated entity of KPMG US, and vice versa," and that according to PCAOB's information, "KPMG Mexico audited, or played a substantial role in the audits of, at least 50 U.S. companies" including coordinating with KPMG US to audit Citigroup and

---

[64] During argument, Defendants asserted that Plaintiffs seemed to "walk away" from the direct agency theory and were no longer pursuing it. *See* D.I. 121 [hereinafter "Hearing Transcript" or "Hrg. Tr."] at 37−38. Plaintiffs countered that they continue to assert a direct agency theory and addressed it in their answering brief. *See id.* at 93−94 (citing D.I. 110 at 50 n.101). For completeness, I consider both the direct agency and sub-agency theories of liability.

[65] Am. Compl. ¶ 530.

[66] *See Id.* ¶ 530.

Banamex.[67]  Plaintiffs do not allege that KPMG US was directly involved in KPMG Mexico's audits of OSA.

### 2. Plaintiffs Fail To Plead A Written Agreement As Required Under Mexico Law.

In cases where foreign law may be applicable, "the party seeking the application of foreign law has the burden of not only raising the issue that foreign law applies, but also the burden of adequately proving the substance of the foreign law."[68]  To assist in my review of Mexico law, each side provided expert affidavits.  Defendants' principal expert is Carlos Loperena ("Loperena," who submitted the "Loperena Declaration"),[69] and Plaintiffs' is Francisco González de Cossio ("González," who submitted the "González Declaration").[70]  Both experts are well-established Mexican lawyers.  I rely on the experts' interpretations of Mexico law, but also turn to relevant authorities to address some of the experts' stalemates on interpretative questions.

Mexico operates on a civil law system, as distinguished from Delaware's or New York's common law system.  Its authority is generally codified into various rules and statutes, the interpretation of which relies only on a narrow subset of case

---

[67] Am. Compl. ¶¶ 531–33.

[68] *Vichi*, 85 A.3d at 765 (quotation omitted).

[69] CCLD D.I. 34 [hereinafter "Loperena Decl."].

[70] CCLD D.I. 99 [hereinafter "González Decl."].

17

law.[71]  Under Mexico law, principal-agent liability cannot exist without an agreement expressly creating such a relationship.[72]  Article 2546 of the Mexican Federal Civil Code ("C.C.D.F.") states, "Agency is a contract by which the agent obligates himself to execute for account of the principal the juridical acts which the latter confides to him."[73]  The agency contract must be ratified in writing when the amount involved is more than approximately $200.[74]

Plaintiffs argue that these principles are inapplicable because the Articles address power of attorney instruments, and assert that a power of attorney is a distinct agency relationship with explicit duties and powers not applicable here.[75] Plaintiffs have failed to prove this is so.  In the United States, a power of attorney is a specific agency relationship with established duties and powers.  In Mexico, a power of attorney is a far more generalized agency relationship used in a variety of settings including commercial transactions and corporate structures.[76]

---

[71] Loperena Decl. ¶ 10; González Decl. ¶¶ 11−13.

[72] *Id.* ¶¶ 44−51.

[73] *Id.* ¶ 46 (quoting C.C.D.F. art. 2546).

[74] *Id.*  ¶ 48 (quoting C.C.D.F. arts. 2555−2556).

[75] D.I. 110 at 50.

[76] *See Wilcox v. Pepsico, Inc.*, 174 F. Supp. 2d 265 (E.D. Pa. 2001); Humberto Gayoua & Robert G. Gilbert, *Legal Building Blocks for Structuring Sales in the Mexican Market*, 25 St. Mary's L. J. 1115 (1994).

Other authorities have explained that Mexico's requirement that an agency relationship be reduced to writing is not limited as Plaintiffs suggest. The United States District Court for the Eastern District of Pennsylvania, quoting C.C.D.F. Article 2546, has stated,

> In Mexico, commercial matters, such as whether a commercial contract created an agency relationship are governed by Mexico Commercial Code and the Civil Code for the Federal District . . . The Civil Code of the Federal District states that, "Agency is a contract whereby an agent obligates himself to act on behalf of a principal and perform those juridical activities he is directed to do."[77]

When dealing with commercial transactions in Mexico, "[a] United States vendor must be aware that Mexico law is much more formalistic. Authority of an agent, even if that agent happens to be an attorney, is never assumed but, rather, must be specifically granted through a formal document (power of attorney)."[78]

It appears to me that in Mexico, a power of attorney is not limited to a distinct agency relationship within the trusts and estates context. The power of attorney articles appear to apply broadly to common law agency as we think of it in the United States. I conclude C.C.D.F. Articles 2546, 2555, and 2256 apply here and require a written agreement establishing an agency relationship.

---

[77] *Wilcox*, 174 F. Supp. 2d at 267 (quoting C.C.D.F. art. 2546).

[78] Gayoua, *Legal Building Blocks*, 25 St. Mary's L. J. at 1136 (citing C.C.D.F. art. 2546).

Plaintiffs do not allege a written agreement establishing a direct agency relationship between KPMG US and KPMG Mexico. Nor do Plaintiffs allege any written agreements between, first, KPMG US and KPMG International, and second, KPMG International and KPMG Mexico. Plaintiffs' direct agency theory and sub-agency theory both fail under Mexico law as pled.

In the absence of a written agreement, Plaintiffs rely on implied and apparent agency to establish vicarious liability. But I do not believe those concepts exist under Mexico law as they do in the United States, precisely because under Mexico law, an express agreement is generally required to establish an agency relationship.[79] Plaintiffs cite to a case they contend demonstrates the concept of apparent authority under Mexico law, but this case is distinguishable because it relies on a specific public policy rationale to hold a hospital liable for services provided on its premises.[80] The court determined apparent authority may be applicable because to determine otherwise would "undermin[e] the values and principles that prevail in the human right to health and the rights of users."[81] Those policy considerations are absent from the matter at hand.

---

[79] Loperena Decl. ¶ 45.

[80] González Decl., Ex. B at 54−55.

[81] *Id.*

The second case Plaintiffs cite is also inapplicable. It describes the concept of apparent authority as when "someone appears to represent[] a mercantile company, claiming to be a necessary or contractual representative, administrator, official, agent or general manager, and with this, a third party generates a conviction that the person has a sufficient representation with a semblance of legitimacy[.]"[82] Here, no such claims have been alleged. And, even if I accepted that Mexico law provides for narrow implied or apparent authority, the allegations set forth in the Amended Complaint fail to adequately allege that the conduct of the relevant KPMG entities evidences that KPMG Mexico generated belief in a third party that it was an agent of KPMG US.[83]

I conclude Mexico law requires a written agreement to hold one entity liable as the agent of another. Plaintiffs have not pled any such agreement. Mexico law favors dismissal of the OSA audit claim against KPMG US.

---

[82] *Id.* at 53−54.

[83] *Id.* at 53−55.

### 3. Plaintiffs Fail To Plead KPMG US Or KPMG International Had Control Over The OSA Audit Opinions As Required Under Delaware Law.

Defendants also seek dismissal of Plaintiffs' claims under Delaware law for failure to plead control specifically with regard to the OSA Audit Opinions.[84] Plaintiffs contend no such specific control need be pled. The parties' briefing on this point was sparse. I have come to the conclusion, informed by numerous Delaware cases, that to hold one entity vicariously liable for the tort of another via agency principles, the plaintiff must plead the principal had control over the wrongdoing at issue. Plaintiffs here have not done so.

As an initial matter, while Delaware courts have noted that "[w]hether an agency relationship exists is normally a question of fact,"[85] Delaware courts have also dismissed claims on the grounds of vicarious liability when only conclusory and insufficient allegations were pled.[86] "[I]f the facts are undisputed, or if there is no

---

[84] D.I. 108 at 51–56; D.I. 112 at 32 ("Under New York and Delaware law, control of the specific underlying audit is the most significant requirement for a principal-agent relationship.").

[85] *Jack J. Morris Assocs. v. Mispillion St. P'rs, LLC*, 2008 WL 3906755, *4 (Del. Super. Aug. 26, 2008); *see also Fisher v. Townsends, Inc.*, 695 A.2d 53, 59 (Del. 1997).

[86] *See, e.g.*, *Skye Mineral Inv'rs, LLC v. DXS Capital (U.S.) Ltd.*, 2020 WL 881544, at *23−24 (Del. Ch. Feb. 24, 2020) (citation omitted) (dismissing agency allegations for failing to adequately pled the right to control agent's conduct); *Baccellieri v. HDM Furniture Indus., Inc.*, 2013 WL 1088338, at *3 (Del. Super. Feb. 28, 2013) (dismissing some agency allegations because they were "devoid of any factual allegations . . . conclusory allegation[s] [are] insufficient to withstand a motion to dismiss"), *aff'd*, 74 A.3d 653 (Del. 2013); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *10

genuine issue of material fact, agency can be decided as a matter of law."[87] Furthermore, when the agency question is potentially dispositive, "permitting the action to proceed to a trial on the merits without solving the agency relationship question could result in needless expenditure of time and effort."[88] "The interest of judicial economy" is best served "by [an immediate] decision on the question of agency relationship."[89]

And so, my analysis begins with the fundamental premise that under ordinary circumstances, one entity will not be held responsible for the actions of another.[90] Delaware law presents two paths to vicarious liability: first, via veil-piercing, instrumentality, or alter-ego theories, which focus on setting aside the corporate form due to the complete domination and control of one entity over another;[91] and

---

(Del. Ch. Aug. 26, 2005) (dismissing agency liability for failure to plead sufficient facts supporting control).

[87] *Baccellieri*, 2013 WL 1088338, at *3.

[88] *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F. Supp. 831, 838 (D. Del. 1978) (acknowledging the parties raised the agency question on a motion to dismiss and that the Court permitted discovery on the issue; treating the motions as cross-motions for summary judgment).

[89] *Id.*

[90] *Id.* at 838.

[91] *Wallace ex rel. Cencom Cable Income P'rs II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) ("The degree of control required to pierce the veil is exclusive domination and control to the point that the [dominated entity] no longer has legal or independent significance of its own.") (internal quotation and original alterations omitted); *Alliance Data Sys. Corp. v. Blackstone Capital P'rs V L.P.*, 963 A.2d 746, 769 (Del. Ch. 2009), *aff'd* 976 A.2d 170 (Del. 2009) ("Delaware law respects corporate formalities, absent a basis for veil-piercing, recognizing that the wealth-generating

second, via agency theory, which respects the corporate form and instead focuses on wrongdoing authorized by one entity, but conducted by another.[92] Vicarious liability through agency does not overlook the distinctions between the entities involved, but instead creates a narrow path to liability focused on the principal's authority and control over the agent's wrongdoing.[93] "Under the doctrine of vicarious liability, a principal may be liable for torts committed by an agent acting within the scope of the agency relationship, i.e., where the agent's tortious conduct is undertaken pursuant to the agency relationship."[94] "[T]he existence of an agency relationship is determined by analyzing several factors used to weigh the amount of authority and control retained by the purported principal."[95] "A defining

---

potential of corporate and other limited liability entities would be stymied if it did otherwise.").

[92] *Skye Mineral*, 2020 WL 881544, at *23 (Providing that an agency relationship "is a fiduciary relationship . . . that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.") (citation omitted).

[93] *See Stinnes*, 1983 WL 21115, at *2; *see also Albert*, 2005 WL 2130607, at *10 (distinguishing theories of agency and piercing the veil).

[94] *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 5994971, at *3 (Del. Ch. Nov. 13, 2018).

[95] *Wavedivision Hldgs., LLC v. Highland Capital Mgmt. L.P.*, 2011 WL 5314507, at *15 (Del. Super. Nov. 2, 2011) ("As the amount of authority and control exerted by the purported principal increase, so does the likelihood that an agency relationship existed."), *aff'd,* 49 A.3d 1168 (Del. 2012).

feature of the principal-agent relationship is the principal's *right to control* the agent's conduct."[96]

As the United States Court of Appeals for the Third Circuit explained in *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*:

> One corporation whose shares are owned by a second corporation does not, by that fact alone, become the agent of the second company. However, *one corporation—completely independent of a second corporation—may assume the role of the second corporation's agent in the course of one or more specific transactions.* This restricted agency relationship may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside the limited agency setting . . . . Under this second theory, *total domination or general alter ego criteria need not be proven*. . . . Unlike the alter ego/piercing the corporate veil theory, when customary agency is alleged the *proponent must demonstrate a relationship between the corporations and the cause of action. Not only must an arrangement exist between the two corporations* so that one acts on behalf of the other and within usual agency principles, *but the arrangement must be relevant to the plaintiff's claim of wrongdoing.*[97]

---

[96] *Skye Mineral*, 2020 WL 881544, at *23 (emphasis in original).

[97] 842 F.2d 1466, 1477 (3d Cir. 1988) (emphasis added) (citing Restatement (Second) of Agency § 14M, Reporter's Notes (1958) ("It is useful to distinguish situations in which liability is imposed on a parent because of the existence of the agency relation, in our common-law understanding of that relation, from cases in which the corporate veil of the subsidiary is pierced for other reasons of policy. Unfortunately, however, the courts have not always observed the distinction between these two separate bases for parent's liability. When liability is fastened upon the parent it is said that the subsidiary is a 'mere agent'. The result has been a weakening and muddying of the term 'agent' and a failure by courts to state the real reasons for their decisions.")).

And as the Superior Court explained:

> When legal liability is predicated on principles of agency, the existence and entity of the agent are not ignored or set aside but affirmed, and the principal held precisely because the agent did act in the course of his employment and within the scope of his authority. The very opposite is true when the subsidiary's corporate entity is set aside and ignored and the parent held liable.[98]

Requiring the principal's authority and control to be linked to the underlying conduct in dispute complements the concept that a principal is only "liable for torts committed by an agent acting within the scope of the agency relationship, i.e., where the agent's tortious conduct is undertaken pursuant to the agency relationship."[99] Accordingly, in assessing an agency theory, "the focus must be directed to the pertinent cause of action."[100]

---

[98] *Stinnes Interoil, Inc. v. Petrokey Corp.*, 1983 WL 21115, at *2 (Del. Super. Aug. 24, 1983) (quoting *Lowendahl v. Baltimore & O.R. Co.*, 287 N.Y.S. 62, 74 (N.Y. App. Div. 1936), *aff'd,* 6 N.E.2d 56 (N.Y. 1936)); *id.* ("There is a fatal flaw in plaintiff's agency theory as applied to the facts in this case. Even if there was an agency relationship, there is no evidence that the plaintiff was aware of it at the time it made the contracts in question, or that it made the contracts under the belief that Petrokey was acting as the authorized agent of Diamond.").

[99] *B&B Fin. Servs., LLC v. RFGV Festivals, LLC*, 2019 WL 5849770, at *3 (Del. Super. Nov. 7, 2019) (citing *Wenske*, 2018 WL 5994971, at *3).

[100] *Phoenix Canada*, 842 F.2d at 1478 ("The evidence of relationship between the parents and subsidiaries as it bears on that breach of contract [at issue] is the proper subject of our inquiry."); *see also C.R. Bard, Inc. v. Guidant Corp.*, 997 F. Supp. 556, 560 (D. Del. 1998) ("[U]nder the agency theory 'only the precise conduct shown to be instigated by the parent is attributed to the parent.'" (quoting *Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F. Supp. 1458, 1464 (D. Del. 1991))).

26

Numerous Delaware cases have reinforced that in an agency analysis, the focus must be on authority or control over the specific wrongdoing at issue. In *Mobil Oil Corporation v. Linear Films, Inc.*, the United States District Court for the District of Delaware emphasized that the "vital prerequisite to imposing liability based upon customary agency principles is finding a close connection between the relationship of the two corporations and the cause of action," *i.e.*, the underlying tort."[101] In that case, "[t]he relevant question [was] whether the alleged principal . . . directed the specific actions of the alleged agent . . . which resulted in infringement of [the plaintiff's] patents."[102]

In *E.I. DuPont de Nemours & Co. v. Rhodia Fiber & Resin Intermediates, S.A.S.*, the District Court dismissed an agency claim seeking to bind a parent to a contract made by its subsidiary. "Defendants assert that '[Parent] was so intimately involved in the [subject] project that [Subsidiary] frequently acted on its behalf[.]'"[103] But, despite this allegation, the Court concluded it was "not willing to

---

[101] *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 271 (D. Del. 1989).

[102] *Id.* at 271–72; *see also Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*, 2007 WL 2153278, at \*2 (3d Cir. July 27, 2007) ("In other words, the relevant inquiry for determining whether Case's European subsidiaries were acting as its agents necessarily must focus on the 'specific transaction' that gave rise to the alleged liability-in this case, the Golden Grain transaction.").

[103] *E.I. duPont de Nemours & Co. v. Rhodia Fiber & Resin Intermediates, S.A.S.*, 197 F.R.D. 112, 127 (D. Del. 2000), *aff'd in part, appeal dismissed in part sub nom. E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 198 (3d Cir. 2001) (affirming agency holding, stating "appellants argue that DuPont's intimate involvement with the Sanlong project renders it liable under traditional

27

use 'traditional principles of contract and agency law' to circumvent the protections of the corporate form[.]"[104] The Third Circuit affirmed this dismissal, citing *Phoenix Canada Oil*: "To bind a principal by its agent's acts, the plaintiff must demonstrate that the agent was acting on behalf of the principal and that the cause of action arises out of that relationship."[105]

The District Court has also concluded that "[u]nder Delaware law, proof of agency within the context of a parent-subsidiary relationship requires that the plaintiff 'demonstrate that the agent was acting on behalf of the principal and that the cause of action arises out of that relationship.'"[106] For this agency theory, "complete domination by the parents in the general conduct of the subsidiaries' affairs is not a prerequisite. The parents and subsidiaries may fully maintain their separate corporate existences; yet, as any two unrelated companies, they might [enter] into a limited agency relationship for a specific transaction."[107]

---

agency principles because DPC acted as DuPont's disclosed agent . . . [t]he District Court correctly rejected this argument").

[104] *Id.*; *id.* at 128 ("DuPont China signed the Joint Venture Contract and DuPont, as a shareholder of DuPont China, stood to benefit from the profits of that contract, but defendants have not shown that DuPont China *acted specifically as DuPont's agent*.") (emphasis added).

[105] *Id.* at 198 (citing *Phoenix Canada Oil,* 842 F.2d at 1477).

[106] *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 531 (D. Del. 2008) (quotation omitted).

[107] *Phoenix Canada Oil*, 842 F.2d at 1478; *accord Applied Biosystems*, 772 F. Supp. at 1463 (citing *Phoenix Canada Oil,* 842 F.2d at 1477) ("[T]wo otherwise independent corporations may develop a restricted agency relationship covering only certain specific transactions."); *see also Trevino*, 583 F. Supp. 2d at 531–32 ("[T]he Court concludes that

The Delaware Superior Court has embraced the Third Circuit and District Court's reasoning in *Mobil Oil* and *Phoenix Canada Oil*. "When applying an agency theory, the Court should focus its inquiry on the arrangement between the corporations, the authority given in the arrangement, *and the relevance of that arrangement to the Plaintiffs' claim*."[108] "Even under the notice pleading rules, it remains incumbent on the pleader to allege some factual predicate to support the agency allegations as to the particular contract."[109] The Court delineated between allegations sufficient to sustain an agency claim on a motion to dismiss, and those that are inadequately pled because they failed to state the circumstances as to how the purported principal caused the purported agent to issue the wrongful purchase orders.[110] "[Plaintiff] merely allege[d] an agency relationship with no factual predicate whatsoever."[111]

The Court of Chancery recently dismissed an agency claim in *Wenske v. Blue Bell Creameries*, determining in denying a motion for reargument that "for liability to attach under customary agency, 'an arrangement [must] exist[ ] between the two

---

Plaintiffs have not sufficiently alleged that an arrangement existed under which MERS acted as an agent of the Shareholder Defendants when MERS engaged in the wrongdoing alleged in the Amended Complaint.").

[108] *Eisenmann Corp. v. Gen. Motors Corp.*, 2000 WL 140781, at *12 (Del. Super. Jan. 28, 2000) (emphasis added).

[109] *Id.* at *13.

[110] *Id.* at *12−13.

[111] *Id.* at *13.

corporations so that one acts on behalf of the other and within usual agency principles, *[and] the arrangement must be relevant to the plaintiff's claim of wrongdoing*."[112] Dismissal was warranted because, "[s]imply stated, the Complaint pleads no facts that support a reasonable inference that [the alleged principal] directed [the alleged agent] to enter into the [agreement] on its behalf[.]"[113]

In *Hospitalists of Delaware, LLC v. Lutz*, two Chancery decisions—one on a motion to dismiss and the second on a motion for summary judgment—addressed agency liability by considering day-to-day control. But, even through that broader lens, the Court still looked to control regarding the subject transaction in sustaining the agency theory of liability. At the motion to dismiss stage, the Court dismissed the veil-piercing theory of liability, but sustained the agency theory of liability based on the alleged principal's day-to-day control of the alleged agent, and the principal's specific directions.[114]

---

[112] *Wenske*, 2018 WL 5994971, at *4−5 (emphasis added) (quoting *O'Leary*, 2011 WL 379300 at *7 (distinguishing between a piercing the veil theory of liability and an agency theory of liability)); *see also Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531 (Del. Ch. July 6, 2018) (dismissing agency claims).

[113] *Wenske*, 2018 WL 5994971, at *5; *see also Albert,* 2005 WL 2130607 (dismissing an agency claim and concluding that there "is simply no allegation in the complaints that [the alleged principal] expressly gave [the alleged agent] the authority to bind it as its agent[,]" and that "plaintiffs have not alleged any facts showing that [the alleged principal] held out [the alleged agent] as its agent").

[114] *Hospitalists of Delaware, LLC v. Lutz*, 2012 WL 3679219, at *16−17 (Del. Ch. Aug. 28, 2012); *id.* at *16 ("the existence of an agency relationship may be inferred from, among other things, the principal's day-to-day control over the agent's business" and noting facts supporting such control); *id.* at *17 ("Assuming Plaintiffs can prove that [the agent], in

30

Then, on summary judgment, the plaintiff sought a declaration that based on a principal-agent relationship, the principal was jointly and severally liable with the agent. The Court denied summary judgment on the grounds that it appeared that a

> significant degree of control [] was being exercised – certainly in the context of the [Master Services] agreement, and perhaps beyond the MSA agreement in certain areas – by [the principal], but as I indicated a moment ago, I think there are . . . issues of material fact as to whether there's a basis here for holding that [the agent] acted as the agent of [the principal] *when it committed the alleged wrongful acts that give rise to the tort liability*.[115]

Thus, an issue of material fact as to the purported principal's control specifically with respect to the underlying tortious acts required the Court to deny summary judgment.

In view of these principles, Delaware law requires plaintiffs seeking to hold a purported principal liable for wrongful acts of the agent to plead control over that specific wrongful act. In this case, Plaintiffs' direct agency theory fails because Plaintiffs do not plead that KPMG US wielded control over the OSA Audit Opinions as KPMG Mexico's principal. Plaintiffs' allegations that the PCAOB lists KPMG Mexico "as an affiliated entity of KPMG US, and vice versa" and that KPMG Mexico worked on audits of U.S. companies, including Citigroup, are unrelated to

---

fact, acted at [the principal's] express direction regarding any of the challenged transactions in this case, it is conceivable that the legal consequences of [the agent's] actions could be attributed to [the principal].").

[115] *Hospitalists of Delaware, LLC v. Lutz*, C.A. 6221-VCP at 61−62 (Del. Ch. Aug. 6, 2013) (TRANSCRIPT).

31

the OSA Audit Opinions.[116] Plaintiffs also allege that KPMG US is a principal to KPMG Mexico "directly through the Citigroup audit" and "culpable for the knowledge and conduct of [KPMGM] . . . in their audits of Oceanografía . . . given the audit clients' extensive business dealings and overlapping audit issues between the two engagements."[117] The allegations that the Citigroup and OSA audits overlap are conclusory. Even if the two audits presented overlapping business dealings and issues, that overlap alone does not adequately establish that KPMG US, which was only directly involved in the Citigroup audit, wielded the necessary control over the content of the OSA Audit Opinions.[118] Plaintiffs in no way allege KPMG US directly had authority or control over the OSA Audit Opinions.[119] Their allegations fall short of adequately pleading agency liability under Delaware law.

---

[116] Am. Compl. ¶¶ 531–533.

[117] *Id.* ¶ 530.

[118] *See id.* ¶ 530. Any theory of agency relying wholly on similarities between the Citigroup audit and OSA Audit Opinions is unreasonable. *See Nemec*, 991 A.2d at 1125 (stating Delaware courts do not "blindly accept conclusory allegations unsupported by specific facts, nor do [they] draw unreasonable inferences in the plaintiffs' favor" on a motion to dismiss).

[119] These allegations also do not plead the day-to-day control that was plead in *Hospitalists of Delaware* to sustain an agency claim on a motion to dismiss. *See* 2012 WL 3679219, at *16 (alleging "that a majority of Cubit's three directors also were Integra directors . . . that Integra and Cubit shared the same: 'management, officers, and employees'; address and physical office space; phone systems, 'hardware, software, and data services'; and a credit card account . . . and payroll").

Plaintiffs' allegations of sub-agency also fail to adequately plead that KPMG US is a principal to KPMG International, and that KPMG International is a principal to KPMG Mexico. Turning first to the relationship between KPMG US and KPMG International, the allegations include that KPMG US is a founding member of KPMG International;[120] that KPMG US' revenues constitute nearly one-third of KPMG's global revenues;[121] and that 40% of the KPMG International Global Management Team are KPMG US personnel, including the Chairman and Global Head of Audit for KPMG International.[122] The last allegation comes closest to alleging that KPMG US has general control over KPMG International, but without further assertions that KPMG US personnel used their positions to control KPMG International in relation to KPMG Mexico or the OSA Audit Opinions, the allegations lack a crucial connection.

Plaintiffs' allegations that KPMG International controls KPMG Mexico similarly miss a piece of the puzzle. Plaintiffs allege that KPMG International may have the right to control KPMG Mexico, but do not allege that KPMG International has yet to do so in any sense, much less specifically with respect to the OSA Audit Opinions. Plaintiffs allege KPMG International may periodically review,

---

[120] Am. Compl. ¶¶ 442, 516−17.

[121] *Id.* ¶ 443.

[122] *Id.* ¶¶ 510−14.

investigate, and discipline a member firm.[123] But these allegations fall short of alleging KPMG International has investigated or disciplined KPMG Mexico with respect to the OSA Audit Opinions, much less controlled the content of those audits.[124] The allegations regarding KPMG South Africa serve to emphasize this distinction;[125] Plaintiffs allege no such similar execution of control over KPMG Mexico. While Plaintiffs do allege that KPMG International provides manuals, software, audit standards, and audit procedures to KPMG Mexico, they fail to connect these standards or procedures directly to the OSA Audit Opinions.[126]

Plaintiffs' general allegations that the KPMG entities present as a unified global organization through KPMG International's objectives;[127] the KPMG International secondment program;[128] the use of the KPMG name;[129] and KPMG International's membership criteria, policies, and regulations also fail to adequately plead that KPMG US or KPMG International had control over KPMG Mexico's

---

[123] *Id.* ¶¶ 469−75.

[124] *Id.* ¶¶ 469−75.

[125] *Id.* ¶¶ 460−68.

[126] *Id.* ¶¶ 455, 458, 501−02.

[127] *Id.* ¶¶ 445−47.

[128] *Id.* ¶ 448.

[129] *Id.* ¶¶ 449−53.

conduct with respect to the OSA Audit Opinion. Plaintiffs' failure to adequately plead this element of agency points to dismissal under Delaware law.[130]

Finally, Plaintiffs contend their sub-agency theory is based on "implied actual authority" in an attempt to avoid having to plead a direct link to the OSA Audit Opinions. Plaintiffs assert,

> KPMG [Mexico] acted with KPMG [International's] ***implied actual authority*** because KPMG [International]: (i) promulgated and enforced policies and procedures with respect to KPMG [Mexico's] audits (¶¶449-52, 454-59, 498-99); (ii) monitored and encouraged KPMG [Mexico's] use of intellectual property (¶¶445-52); (iii) administered regular and specially mandated firm reviews to ensure compliance with its policies and procedures (¶¶453, 456, 469-75); and (iv) could impose disciplinary measures for noncompliance (¶¶453, 472-75) . . . Plaintiffs further allege that Defendants understood they were creating an agency relationship.[131]

Plaintiffs allege that even though KPMG International may not have communicated with KPMG Mexico about the OSA Audit Opinions, that deficit is not dispositive because they have alleged KPMG Mexico acted with implied actual authority.[132] Plaintiffs point to two implied authority cases in support.[133]

---

[130] These allegations also do not plead the day-to-day control that was plead in *Hospitalists of Delaware* to sustain an agency claim on a motion to dismiss. *See supra* note 119.

[131] D.I. 110 at 48−49 (emphasis in original).

[132] D.I. 110 49.

[133] *Id.* at 49 n.100.

I conclude Plaintiffs' cases do not excuse their failure to plead that the principal's authority, of whatever sort, was tied to the specific act of wrongdoing.[134] In both cases, the parties asserting agency tied their allegations of implied authority to an arrangement relevant to the cause of action. The first case, *Jack J. Morris Associates v. Mispillion Street Partners, LLC*, involved allegations that a former general manager of a limited liability company had the authority to enter into an agreement on the company's behalf. [135] The alleged agent testified that the limited liability company "was aware of Plaintiff's involvement in the project and [the former general manager's] actions *concerning the Agreement [at issue]*."[136] The second case, *Wilson v. Active Crane Rentals, Inc.*, involved allegations that an independent contractor hired to build a new franchise location had the authority to enter into an agreement on a franchisee's behalf.[137] The alleged agent submitted an affidavit that he had authority to enter into contracts on the principal's behalf.[138]

---

[134] *See Albert*, 2005 WL 2130607, at *10 (noting that various brands of authority fall under the rubric of agency liability, and must be tethered to the wrongdoing at issue).

[135] *Jack J. Morris Assocs. v. Mispillion Street P'rs, LLC*, 2008 WL 3906755 (Del. Super. Aug. 26, 2008).

[136] *Id.* at *3 (emphasis added) (sustaining agency claim on summary judgment and determining that "[w]hether [alleged agent] reasonably believed that he had Defendant's authority to enter into a contract with Plaintiff based on his relationship with Defendant is for the jury to decide").

[137] *Wilson v. Active Crane Rentals, Inc.*, 2004 WL 1732275 (Del. Super. July 8, 2004).

[138] *Id.* at *2 (sustaining agency claim on summary judgment where alleged principal "testified that he did not give [alleged agent] the authority to enter into contracts on [alleged principal's] behalf, [but alleged agent's] affidavit refutes that" and emphasizing that "the

Thus, the evaluation of the agent's authority was still within the context of the agent's questioned actions.

Pleading implied authority does not obviate the need to review an agency relationship as tethered to the wrongdoing. "The determination of implied authority depends on the relationship between the principal and agent, not what a third party believes about the relationship. That is, implied authority is authority that the agent reasonably believes he has as a result of the principal's actions."[139] Regardless of whether express, implied, or apparent authority is adequately pled, the authority at issue must be tied to the specific act of wrongdoing.

Here, Plaintiffs fail to plead an arrangement between KPMG US and KPMG International, and one between KPMG International and KPMG Mexico, let alone an arrangement granting authority in relation to the OSA Audit Opinions. To hold one entity vicariously liable for the tort of another via agency principles, Delaware law requires a plaintiff to plead the principal had control over the wrongdoing at issue. Plaintiffs have not done so here; their agency theories are inadequately pled under Delaware law.[140]

---

Court is not concluding that implied authority actually existed, but merely that it is possible for the jury to find that the prior course of dealing between [the alleged principal and agent] gave rise to an implication of actual authority given the state of the record").

[139] *Id.*

[140] I construe Plaintiffs' arguments to be asserting an agency theory of liability. If the claims asserted an alter-ego, instrumentality, or veil piercing theory, they would still fail. Plaintiffs have not pled complete domination or control, nor fraud. *See, e.g.*, *Mobil Oil*,

### 4. Plaintiffs Fail To Plead KPMG US Or KPMG International Had Control Over The OSA Audit Opinions As Required Under New York Law.

New York law requires three elements to establish a principal-agent relationship: (1) a "manifestation by the principal that the agent shall act for him; (2) acceptance of the undertaking by the agent; and (3) an understanding between the parties that the principal is to be in control of the undertaking."[141] "The element of control often is deemed the essential characteristic of the principal-agent relationship."[142] Under New York law, as under Delaware law, Plaintiffs must plead that the principal had control over the underlying conduct at issue.[143] In *Star Energy Corp. v. RSM Top-Audit*, the United States District Court for the Southern District of New York determined that plaintiffs failed to allege "that RSM International was

---

718 F. Supp. At 271 n.15 ("As stated above, agency in this sense of complete domination and control is synonymous with 'alter ego,' 'instrumentality,' 'piercing the corporate veil,' and 'disregarding the corporate entity.'"); *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 793 (Del. Ch. 1992) ("As to the sufficiency of plaintiff's alter ego claim, I note that a court can pierce the corporate veil of an entity where there is fraud or where a subsidiary is in fact a mere instrumentality or alter ego of its owner."); *Stinnes*, 1983 WL 21115, at *1 ("As to the instrumentality theory, which is applied when the subsidiary is determined to be controlled or dominated by the parent to the point that the subsidiary is a mere instrumentality or department of the parent . . . it results in the disregard of the corporate entity of the subsidiary which is the same as piercing the corporate veil.").

[141] *Star Energy Corp. v. RSM Top-Audit*, 2008 WL 5110919, at *2 (S.D.N.Y. Nov. 26, 2008) (quotation omitted).

[142] *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 290 (S.D.N.Y. 2005).

[143] *See Star Energy*, 2008 WL 5110919, at *2.

in control of RSM Top-Audit in its business dealings with Star Energy," the conduct at issue.[144]

> In lieu of claiming that RSM International controlled RSM Top-Audit's audits of Volga-Neft, plaintiff alleges that RSM International exercised control because it, among other things, 'controlled RSM Top-audit's eligibility for membership and ability to use the RSM brand name,' and 'promulgat[ed] the audit manual and policies that enabled RSM Top-Audit' to provide services to U.S. companies.[145]

The court found that plaintiffs' failure to allege "that RSM International had any control over RSM Top-Audit in its dealing with Star Energy" meant that "the essential element of control [was] lacking."[146]

The Southern District of New York confirmed the importance of this pleading requirement in *Anwar v. Fairfield Greenwich Ltd.*, finding the allegation that the principal merely possesses "the general right to control any aspect of its affiliated entities' conduct" was inadequate.[147]  Instead, a plaintiff must plead control over the specific audit at issue.  "[A] theory of general control is not supported by the case law.  A principal auditor's control of its agent auditor must come in a more focused form."[148]  In dismissing the vicarious liability claims against the international

---

[144] *Id.* at *3 (citations omitted).

[145] *Id.*

[146] *Id.* at *4 (citations omitted).

[147] *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 460 (S.D.N.Y. 2010).

[148] *Id.* at 459 (citing *Star Energy*, 2008 WL 5110919, at *3).

accounting firm with respect to its member firms' deficient audits, the court confirmed that "[a]llegations of generalized control are insufficient to state a plausible claim of coordinating-entity control over its member firms in the auditing context."[149]

Similarly here, Plaintiffs fail to allege that KPMG US or KPMG International had control over KPMG Mexico's conduct with respect to the OSA Audit Opinions. Plaintiffs strive to analogize their pleadings here to those against auditors in two cases inspired by the collapse of Parmalat Finanziaria, S.p.A. and Parmalat S.p.A., due to the discovery of a massive fraud, both styled *In re Parmalat Sec. Litig.* ("*Parmalat I*" and "*Parmalat II*").[150] The plaintiffs in those cases stated adequate claims against the Parmalat entities' network of accounting firms.[151] But here, Plaintiffs' pleading falls short.

In *Parmalat I*, the plaintiffs alleged the member firm partner in charge of the subject audit received concerns from auditors that the audit could not be issued cleanly.[152] The partner then allegedly "sought direction and help from [the international umbrella firm], from which it could be inferred that [the international

---

[149] *Id.* at 461.

[150] *In re Parmalat Sec. Litig.* (*Parmalat I*), 375 F. Supp. 2d 278 (S.D.N.Y. 2005); *In re Parmalat Sec. Litig.* (*Parmalat II*), 598 F. Supp. 2d 569 (S.D.N.Y. 2009).

[151] *Parmalat I*, 375 F. Supp. 2d at 282; *Parmalat II*, 598 F. Supp. 2d at 570.

[152] *Parmalat I*, 375 F. Supp. 2d at 293.

umbrella firm] was in ultimate control of the audit."[153] When an auditor threatened to withhold certification from the financial statements, the international firm removed the auditor from the audit.[154] The international firm allegedly "confronted the auditors who had detected the fraud [and raised questions] and told them to keep quiet."[155] The court determined plaintiffs adequately alleged an agency relationship between the international firm and member firm, such that the international firm could be vicariously liable for the underlying wrongdoing.[156] Thus, the international firm was directly involved with the audit at issue.

In *Parmalat II*, the plaintiff presented significant evidence that Grant Thornton International ("GTI") controlled GT Italy's ability to conduct audits. The court therefore denied a motion for summary judgment, refusing to dismiss a claim that GTI was liable for GTI Italy's securities fraud.[157] For example, GTI provided GT Italy with the "tools prescrib[ing] the 'manner and method' by which member firms conducted audits."[158] The court explained that these "went beyond mere

---

[153] *Id.* at 294.

[154] *Id.*

[155] *Id.* (quotation omitted).

[156] *Id.* at 293−296.

[157] *Parmalat II*, 598 F. Supp. 2d at 580−82. Although *Parmalat II* considers the control issue under the summary judgment standard, the identification of control as a material issue in evaluating a sub-agency relationship is useful in assessing whether the Amended Complaint sufficiently pled vicarious liability under the motion to dismiss standard.

[158] *Id.* at 576.

'guidelines'" and instead "dictat[ed] step-by-step instructions for auditors."[159] Additionally, the court determined "GT Italy's tailoring of the audit methodology was limited," with a GT Italy partner testifying that "'adapting' GTI audit to the 'Italian situation' meant translating it into Italian and using only those procedures applicable to a specific client."[160] Most importantly, in compliance with *Star Energy* and *Anwar*, the plaintiffs presented evidence that GTI expressly intervened in the very audit at issue in *Parmalat*.[161]

As for the relationship between the U.S. firm and the international firm, the *Parmalat II* court noted that GTI relied heavily on Grant Thornton U.S. ("GT US") to function. GT US "provided GTI with funding, office space[,] and employees."[162] Indeed, "GTI operated out of GT US'[] Chicago offices."[163] Also, "there [was] evidence that GT US controlled significant GTI decisions through its role in the

---

[159] *Id.*

[160] *Id.* at 577.

[161] *Id.* at 575 ("Additionally, in the wake of the Parmalat collapse, GTI threatened GT Italy with expulsion unless managing partner Lorenzo Penca resigned from that position immediately whereupon GT Italy suspended Penca and a second partner and Parmalat auditor."); *see Anwar*, 728 F. Supp. 2d at 460 ("[T]he plaintiffs in *Parmalat*—unlike Plaintiffs in the present suit—sufficiently alleged the control of the auditor member firms at issue by principal because they assert facts from which the court could infer sufficient involvement by the principal in the preparation of the audits at issue, as opposed to, as in this case, the principal merely possessing the general right to control any aspect of its affiliated entities' conduct, or having actually exercised some control over the member firms' operations and audits generally.").

[162] *Parmalat II*, 598 F. Supp. 2d at 578.

[163] *Id.* at 579.

Executive Partners Group."[164]  In determining "[t]he evidence suggests that GTI is disproportionately dependent upon and influenced by a single member firm: GT–US[,]," the court emphasized that GT US has the "power to veto significant decisions related to GTI governance and structure."[165]  The plaintiffs in *Parmalat II* pled that the international membership firm expressly intervened in the audit at issue and that the American member firm had sufficient control over the international entity.

Here, Plaintiffs' sub-agency allegations fail to demonstrate the level of control by the umbrella entity evidenced in the *Parmalat* opinions.  Plaintiffs fail to plead that KPMG International was involved with KPMG Mexico's audit of OSA.[166]  Instead, they allege only that KPMG International conducts internal and external inspections of its member firms to maintain quality audit services.  Moreover, Plaintiffs' general allegations that the KPMG entities present as a unified global organization fail to adequately plead that KPMG US or KPMG International had control over KPMG Mexico's conduct with respect to the OSA Audit Opinion.[167]  Plaintiffs' failure to adequately plead this element of agency compels dismissal under New York law.

---

[164] *Id.*

[165] *Id.* at 578.

[166] Plaintiffs contend they should be permitted to conduct discovery on this point.  Hrg. Tr. at 96−97.  The sub-agency pleadings are entirely too sparse to pass muster under the notice pleading standard.  Plaintiffs' request is denied.

[167] Am. Compl. ¶¶ 445−53.

Additionally, Plaintiffs do not plead that KPMG International, KPMG US or KPMG Mexico commingled personnel or resources to the extent that the GTI firms did in *Parmalat II*. Rather, they allege that KPMG US and KPMG International share personnel on a Global Management Team and that former KPMG International Global Heads of Audit previously worked for KPMG US. Plaintiffs' sub-agency theory fails under New York law.

As for the direct agency allegations, the PCAOB assertions are generally limited to that regulatory body, and fail to demonstrate KPMG US controlled KPMG Mexico with respect to the OSA Audit Opinions. Additionally, the allegations of overlapping issues between the Citigroup and OSA audits are conclusory and fail to adequately plead KPMG US contributed to, or controlled, any content in the OSA Audit Opinions. Without more factual support, the jump from KPMG US' work on the Citigroup audits to its liability for the OSA Audit Opinions is an unfounded leap.[168] Plaintiffs fail to plead KPMG US is KPMG Mexico's principal for purposes of the OSA Audit Opinions under New York law.

Thus, Plaintiffs have failed to allege that KPMG US had control over the OSA Audit Opinions as necessary to allege direct agency, and that KPMG International had that control as necessary to allege sub-agency. Plaintiffs also fall short of

---

[168] *See id.* ¶ 530; *supra* note 118.

pleading KPMG US controls KPMG International. Plaintiffs' agency theories are inadequately pled under New York law.

* * * * *

Plaintiffs have failed to meet the standards set by the law of Mexico, Delaware, and New York to plead that KPMG Mexico was KPMG US' direct agent for purposes of the OSA Audit Opinions, or that KPMG Mexico was KPMG US' sub-agent through KPMG International. Plaintiffs have failed to plead the written agreement required under Mexico law, and the control over the wrongdoing at issue required under Delaware and New York law. Since there is no actual conflict of laws, I hold Plaintiffs have failed to plead vicarious liability through an agency theory.[169]

## B. Plaintiffs Have Not Adequately Alleged Vicarious Liability Under A Joint Venture Theory.

Plaintiffs also assert that KPMG US is vicariously liable for KPMG Mexico's negligent misrepresentations in the OSA Audit Opinions under a joint venture theory. Plaintiffs allege that KPMG International, KPMG US, and KPMG Mexico acted as joint venturers to provide professional services to Citigroup, Banamex, and OSA.[170] Plaintiffs point to the KPMG International governing statutes' statement

---

[169] *See supra* notes 46–49.

[170] Am. Compl. ¶¶ 534−550.

that each member firm "shall comply with membership criteria," including the ability to "share resources (incoming and outgoing)," and characterize that statement as a commitment to share profits and losses.[171] Plaintiffs also characterize the governing statutes' statement that each member firm "shall comply with membership criteria," including the ability to "manage risk," as a commitment to share risks.[172] As for joint contributions, Plaintiffs allege simply that "KPMG International, KPMG US[,] and KPMG Mexico contributed both funds and significant personnel that were used to carry out the specific provision of services to Citigroup, Banamex and Oceanografía."[173]

Plaintiffs' allegations of control mirror their agency allegations, focusing on KPMG International's ability to review member firms every three years.[174] The joint venture allegations regarding sharing of personnel also mirror the agency allegations, focusing on the secondment program.[175] Lastly, the allegations that KPMG International, KPMG US, and KPMG Mexico operate as one firm are based on the entities' "view that they were acting as one global enterprise in providing their

---

[171] *Id.* ¶ 537.

[172] *Id.* ¶¶ 539−540.

[173] *Id.* ¶ 541.

[174] *Id.* ¶ 544.

[175] *Id.* ¶¶ 546−547.

audit[s] . . . to Citigroup, Banamex, and Oceanografía."[176]  Plaintiffs allege that KPMG's publicly available materials emphasize the organization is unified, providing services worldwide; and that the use of the KPMG name is strictly regulated once a member firm joins KPMG International.[177]

Plaintiffs' joint venture theory fails under each choice of law.  Accordingly, there is no actual conflict of laws; and I hold Plaintiffs' joint venture theory fails to state a claim pursuant to Delaware law.[178]

### 1. Plaintiffs Fail To Plead A Written Agreement As Required Under Mexico Law.

Defendants argue that under Mexico law, an express written agreement or statute is necessary to create a joint venture.[179]  Defendants cite as their primary authority C.C.D.F. Article 1988, which states in part, "Solidarity [joint liability] is not presumed; it results from the law or from the will of the parties."[180]  Plaintiffs claim that Mexico law recognizes other theories of joint venture liability that do not require a written agreement and are applicable here.[181]  I reject Plaintiffs' other

---

[176] *Id.* ¶¶ 548−550.

[177] *Id.* ¶¶ 548−550.

[178] *See supra* notes 46–49.

[179] Loperena Decl. ¶¶52-56 (quoting C.C.D.F. art. 1988).

[180] *Id.* ¶52 (quoting C.C.D.F. art. 1988 (providing that vicarious or joint liability is very limited and available only where explicitly provided for by statute or contract)).

[181] D.I. 110 at 51−52.

theories; believe Mexico law requires a written agreement to establish a joint venture between KPMG International, KPMG US, and KPMG Mexico; and conclude no such agreement was pled.[182]

First, Plaintiffs allege Article Two of the Corporations General Statute "recognizes vicarious liability for members of *de facto* entities not established in writing, but through several individuals or entities acting as a single enterprise."[183] The relevant portions of Article Two state: (i) "The corporations not inscribed in the [Public Registry of Commerce] . . . with or without formal incorporation, will have legal personality,"[184] and (ii) "The shareholders/partners not responsible of the irregularity, may request damages to the responsible ones, and those who act as representatives and agents of the irregular corporation."[185] Plaintiffs allege that "[u]nder Mexico law, a *de facto* entity exists when, even though it is not established through a written contract and is not formally incorporated, several parties (individuals or entities) have acted as a single entity in a public way"[186] and that "*[d]e facto* entities operate as a form of *de facto* joint ventures in that they are

---

[182] Loperena Decl. ¶¶52-56; *see generally* Rona R. Mears, *Joint Ventures in Mexico: A Current Perspective*, 23 St. Mary's L. J. 611 (1992).

[183] D.I. 110 at 51.

[184] González Decl. ¶ 130, n.68 (internal quotation marks omitted) (quoting Corporations General Statute art. 2).

[185] *Id.* ¶ 130, n.69 (internal quotation marks omitted) (quoting Corporations General Statute art. 2).

[186] *Id.* ¶ 130 (emphasis in original).

established without express written agreements but each member conducts itself as a joint venturer as a practical matter and is therefore liable for the acts of the others."[187]

Plaintiffs misapply the concept of a *de facto* entity. Under Mexico law, a *de facto* entity is one that has failed to register with the Public Registry of Commerce.[188] "Companies not recorded in the Public Registry of Commerce that have exteriorized their status to third parties, whether or not they have formalized it with a notarial deed [escritura pública] shall enjoy a legal personality."[189] Representatives of these entities can be held liable because the entities themselves do not formally exist under Mexico law.[190]

Plaintiffs have not alleged that the KPMG entities have failed to file the proper paperwork with the Public Registry of Commerce. And the concept that the KPMG entities acted as a single entity such that they were required to register with the Public

---

[187] *Id.* ¶ 131 (emphasis in original).

[188] Corporations General Statute art. 2; Boris Kozolchyk & Cristina Castañeda, *Invigorating Micro and Small Business Through Secured Commercial Credit in Latin America: The Need For Legal And Institutional Reform*, 28 Ariz. J. Int'l & Comp. L. 43, 94 (Spring 2011).

[189] Kozolchyk, *Invigorating Micro and Small Business*, 28 Ariz. J. Int'l & Comp. L. at 94 (quoting Corporations General Statute art. 2).

[190] *Id.* at 94−95 (quoting Corporations General Statute, Art. 2) ("Those who carry out juristic acts as representatives or agents of an irregular company, shall be responsible to third parties for their performance in a subsidiary, joint, several and unlimited manner, aside from the criminal liability in which they may have incurred if third parties were injured.").

Registry misconstrues Mexico law on *de facto* entities. This law is meant to create a source of liability for entities flying under the legal radar, not to merge separate legally recognized entities.[191] KPMG US, KPMG International, and KPMG Mexico did not act as a *de facto* joint venture.

Second, Plaintiffs contend Article 1917 of the Mexican Federal Civil Code "recognizes joint liability where persons or entities 'cause in common' injury, regardless of each party's level of involvement," without a written agreement.[192] The only case Plaintiffs cite to support this theory is distinguishable. The Mexican Supreme Court determined that the leader of a union had "joint liability with the union to answer for the damages caused by their wrongful acts."[193] This case does not conflate separate entities into one joint venture.

Plaintiffs do not allege a written agreement establishing a joint venture between KPMG International, KPMG US, and KPMG Mexico. In the absence of a written agreement, Plaintiffs have failed to adequately demonstrate that the KPMG

---

[191] *Id.*

[192] D.I. 110 at 51 (citing González Decl. ¶¶ 122-25; D.I. 110 [hereinafter "González Resp. Decl."] ¶¶63-66); González Decl. ¶122 (quoting C.C.D.F. art. 1917) ("all the parties that cause a common injury are jointly liable for [all the damages]").

[193] González Resp. ¶ 66 n.54, Ex. C. at 26−27.

50

entities to "cause in common injury" in a manner recognized by Mexico law.[194]

Accordingly, Mexico law precludes a joint venture theory of vicarious liability.

### 2. Plaintiffs Fail To Plead the Five Elements of Joint Venture As Required Under Delaware Law.

Under Delaware law, joint venture liability requires "(1) a community of interest in the performance of a common purpose, (2) joint control or right of control, (3) a joint proprietary interest in the subject matter, (4) a right to share in the profits, (5) a duty to share in the losses which may be sustained."[195]  A joint venture

> may be implied or proven by facts and circumstances showing that (a relationship of joint venture) was in fact entered into . . . [it] has been broadly defined as an enterprise undertaken by several persons jointly to carry out a single business enterprise, not amounting to a partnership, for their mutual benefit, in which they combine their property, money, effects, skill and knowledge.[196]

---

[194] D.I. 110 at 51 (citing González Decl. ¶¶ 122-25; González Resp. ¶¶63-66); González Decl. ¶122 (quoting C.C.D.F. art. 1917) ("all the parties that cause a common injury are jointly liable for [all the damages]").

[195] *Warren v. Goldinger Bros.,* 414 A.2d 507, 509 (Del. 1980) (*quoting Kilgore Seed Co. v. Lewin*, 141 So. 2d 809 (Fla. Dist. Ct. App. 1962)).

[196]  *J. Leo Johnson, Inc. v. Carmer*, 156 A.2d 499, 502 (Del. 1959).

51

As then-Vice Chancellor Strine put it, "joint venture status is established only where an express or implied contract is created."[197] The existence of a joint venture may be determined on a motion to dismiss; it is not a precluded question of fact.[198]

Fundamentally, Plaintiffs fail to allege that KPMG International, KPMG US, and KPMG Mexico had a relationship or agreement, express or implied, to perform a common purpose as required under Delaware law.[199] Plaintiffs have failed to plead every element, from joint control to a right to share in the profits. Instead, they plead conclusory allegations that lack any factual support. Plaintiffs' allegations that the KPMG International governing statutes provide a clear statement of a commitment of the KPMG entities to share profits, losses, and risks are inadequate.[200] Plaintiffs plead no further allegations describing the profit and loss sharing structure between the entities. The allegations of joint contributions, a joint right to control, sharing of personnel, and an intent to form a joint venture are also insufficient.[201] Plaintiffs fail

---

[197] *Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC*, 2010 WL 975581, at *2 (Del. Ch. Mar. 4, 2010) (citing 46 Am. Jur. 2d *Joint Ventures* § 9 (2009), *aff'd,* 7 A.3d 485 (Del. 2010).

[198] *See Wenske*, 2018 WL 5994971, at *8 (dismissing a joint venture claim, stating "Plaintiffs are correct that facts and circumstances *may* demonstrate the existence of a joint venture, even if an agreement expresses a contrary intent. The facts and circumstances as pled here, however, do not support a reasonable inference that BB GP and BB USA formed a joint venture to manage BB LP." (emphasis in original) (citations omitted)).

[199] *Sunrise Ventures*, 2010 WL 975581, at *2 (citing 46 Am. Jur. 2d *Joint Ventures* § 9 (2009)).

[200] Am. Compl. ¶¶ 537, 539−540.

[201] *Id.* ¶¶ 541−542, 544, 546−550.

to adequately allege that KPMG US controls KPMG International and that KPMG International in turn controls KPMG Mexico. Plaintiffs have failed to plead a joint venture theory of vicarious liability under Delaware law.

### 3. Plaintiffs Fail To Plead the Four Elements of Joint Venture As Required Under New York Law.

Under New York law,

A joint venture is a special combination of two or more persons where in some specific venture a profit is jointly sought . . . The indicia of the existence of a joint venture are: (i) acts manifesting the intent of the parties to be associated as joint ventures; (ii) mutual contribution to the joint undertaking through a combination of property, financial resources, effort, skill or knowledge; (iii) a measure of joint proprietorship and control over the enterprise; and (iv) a provision for sharing of profits and losses.[202]

"The ultimate inquiry is whether the parties have so joined their property, interests, skills and risks that for the purpose of the *particular adventure* their respective contributions have become as one . . . ."[203] Specifically, a successfully pled joint venture theory in the context of an audit by one firm within a network requires allegations that raise "an inference that 'each firm had an equal right to direct the policies of another firm'" with regard to the audits at issue.[204] For example, in the

---

[202] *Decker, Decker & Assocs., Inc. v. Ass'n of Nat'l Advertisers, Inc.*, 2007 WL 1053881, at *5 (N.Y. Sup. Ct. Apr. 10, 2007) (quotations omitted).

[203] *In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 590 (S.D.N.Y. 2007) (emphasis added) (quoting *Decker*, 2007 WL 1053881, at *7), *aff'd sub nom. Pappas v. Bank of Am. Corp.*, 309 Fed. Appx. 536 (2d Cir. 2009).

[204] *In re Parmalat Sec. Litig.*, 421 F. Supp. 2d 703, 718 (S.D.N.Y. 2006).

*Parmalat* litigation, the Southern District of New York found that the plaintiffs' failure to sufficiently allege a "mutual right to exercise control over the enterprise" resulted in dismissal of their joint venture theory against auditors.[205] "The mutual right to exercise control over the enterprise refers to 'the right to direct and govern the conduct of each other in connection with the joint venture.'"[206] The court opined:

> Bondi argues that DTT and its member firms, including Deloitte USA, are a unified, integrated firm. But this oft-repeated mantra does not address the key issue of mutual right to exercise control over sister firms relating to the Parmalat audit. Bondi again emphasizes the unified dispute resolution and auditing standards, but remains unable to inflate those allegations into an inference that "each firm had an equal right to direct the policies of another firm" with regard to the Parmalat audit.[207]

In another example, the court dismissed a plaintiff's joint venture claim because he made "no express allegation . . . that [the plaintiff] agreed to share the losses of the venture with [the defendants]."[208] "Rather, plaintiff, in the complaint, merely state[d] that he and [the defendant] agreed to share in the equity and income from the venture."[209] The court noted that "an agreement to share the losses of a joint venture is an indispensable element of finding the existence of a joint venture,"

---

[205] *Id.* at 717−718.

[206] *Id.* at 717.

[207] *Id.* at 718.

[208] *Mawere v. Landau*, 2013 WL 2217757 at *6 (N.Y. Sup. Ct. May 15, 2013).

[209] *Id.*

and that a joint venture cause of action is not stated "'if the plaintiff does not allege a mutual promise or undertaking to share the burden of the losses of the alleged enterprise[.]'"[210]

Thus, New York law narrowly defines a joint venture to include acts manifesting intent, mutual contribution, joint proprietorship and control, and a provision for the sharing of profits and losses. Each category must be pled with sufficient factual allegations. Here, Plaintiffs have failed to do just that; instead, they plead solely conclusory allegations that lack any factual support. They have failed to plead every element, from joint control to a right to share in the profits.[211] Plaintiffs also fail to allege, as required, that KPMG International, KPMG US, and KPMG Mexico intended to form a joint venture or entered into any agreement to do so. Nor do Plaintiffs allege that the joint venture was established to provide services regarding the OSA Audit Opinions. New York law precludes a joint venture theory of vicarious liability.

\* \* \* \* \*

Plaintiffs have failed to demonstrate that joint venture liability exists under Mexico law. They have also failed to adequately plead the elements of a joint venture under Delaware and New York law. Because there is no actual conflict of

---

[210] *Id.*

[211] *See also supra* 51–53.

55

laws, the claim that KPMG US is liable for KPMG Mexico's OSA Audit Opinions as part of a joint venture is dismissed pursuant to Delaware law.[212]

## III. CONCLUSION

For the foregoing reasons, the Motion is granted. Count I of the Amended Complaint is dismissed with prejudice. The First Opinion continues to govern dismissal of Counts II and III, and Defendants KPMG International and KPMPG Mexico. The parties shall submit a stipulated implementing order within twenty days.

---

[212] *See supra* notes 46–49.